UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UPSTATE SHREDDING, LLC and
WEITSMAN SHREDDING, LLC,

                              Plaintiffs,

              -against-                                    3:12-CV-1015 (LEK/DEP)

NORTHEASTERN FERROUS, INC., and
JAY GOLDBLATT,

                              Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

On June 21, 2012, Plaintiffs Upstate Shredding, LLC ("Upstate") and Weitsman Shredding,

LLC (collectively, "Plaintiffs") commenced this action asserting claims for breach of contract,

common law fraud, conversion, and unjust enrichment. Dkt. No. 1 ("Complaint"). In their Answer,

Defendants Jay Goldblatt ("Goldblatt") and Northeastern Ferrous, Inc. ("Northeastern")

(collectively, "Defendants") counterclaimed against Plaintiffs on the same causes of action

advanced by Plaintiffs, and additionally sued Adam Weitsman ("Weitsman") individually. Dkt. No.

9 ("Answer"). In a Memorandum-Decision and Order filed September 30, 2014, the Court granted

summary judgment in favor of Defendants on all of Plaintiffs' claims and on Northeastern's breach

of contract counterclaim against Plaintiffs. Dkt. No. 39 ("September Order").

This matter returns to the Court on Plaintiffs' Motion for reconsideration of the Court's

September Order and to reopen discovery. Dkt. Nos. 91 ("Motion for Reconsideration"); 91-26

("Plaintiffs Reconsideration Memorandum").[1]  Defendants opposed the Motion and Plaintiffs filed a

Reply.  Dkt. Nos. 97-6 ("Defendants Response Memorandum – Motion for Reconsideration"); 102

("Plaintiffs Reply – Motion for Reconsideration").[2]  Defendants have filed a Motion to preclude

evidence and for the award of attorneys' fees pursuant to Federal Rule of Civil Procedure 37.  Dkt.

Nos. 98 ("Motion to Preclude"); 98-5 (Motion to Preclude Memorandum").  Plaintiffs oppose this

Motion and cross-moved for attorneys' fees.  Dkt. Nos. 104 ("Plaintiffs Cross-Motion"); 104-4

("Plaintiffs Cross-Motion Memorandum").  Defendants also moved for sanctions pursuant to

Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 against Plaintiffs.  Dkt. Nos. 109-9

("Motion for Sanctions"); 109-9 ("Motion for Sanctions Memorandum").  Finally, Defendants

moved to enforce the Protective Order entered by the Court.  Dkt. Nos. 112 ("Motion to Enforce

Protective Order"); 112-2 ("Motion to Enforce Protective Order Memorandum").[3]

For the following reasons, Plaintiffs' Motion for reconsideration, Cross-Motion for

attorneys' fees, Defendants' Motion to preclude, and Motion for sanctions are all denied.  Plaintiffs'

request for attorneys' fees in response Defendants' Motion for sanctions and Defendants' Motion to

enforce the Protective Order are granted.

---

[1] Certain documents in support of Plaintiffs' Motion for reconsideration, including the Memorandum of law, were filed with the Court under seal.  Dkt. Nos. 92; 93.

[2] Defendants' Memorandum of law in support of their Response to Plaintiffs' Motion for reconsideration was filed with the Court under seal.  Defs. Resp. Mem. – Mot. Recons.  Plaintiffs' Reply in support of their Motion was also filed with the Court under seal.  Dkt. No. 105.

[3] In anticipation of the trial on damages, the Court set deadlines for filing motions *in limine*. Dkt. Nos. 50; 63; Text Minute Entry (June 23, 2015).  On July 16, 2015, Plaintiffs filed a Motion *in limine*.  Dkt. No. 83.  However, on July 21, 2015, due to Plaintiffs' Motion for reconsideration, the deadline to file motions *in limine* was adjourned indefinitely.  Dkt. No. 88.  Accordingly, the Court will not address Plaintiffs' Motion *in limine* in this Memorandum-Decision and Order.  The deadline to file motions *in limine* will be reset when the Court sets a new trial date.

## II.    BACKGROUND

The Court recounts the background and procedural history of the case.  For further background, reference is made to the September Order.  Plaintiffs are New York corporations engaged in the purchase and processing of scrap metals.  Sept. Order at 2.  In or around September 2010, Plaintiffs began purchasing scrap metal from Northeastern, a Canadian corporation.  Id. Plaintiffs would quote Northeastern a price per ton of scrap and Northeastern would then arrange for a shipping company to haul the scrap to Plaintiffs' New York facility.  Id.

When a shipment arrived at Plaintiffs' facility, Plaintiffs' employees would weigh the shipment and determine the amount of dirt and other non-processable materials present.  Id.  The amount of non-scrap material would be deducted from the total weight of the shipment in order to determine the price owed to Northeastern.  Id.

Starting in June or July of 2011, Plaintiffs began to withhold payments for received shipments.  Id. at 3.  Northeastern subsequently stopped making shipments to Plaintiffs.  Id. Weitsman then met Goldblatt, an owner of Northeastern, and assured him that Plaintiffs would resume payments if Northeastern resumed shipments.  Id.  Northeastern resumed shipments, but Plaintiffs did not pay for any of them.  Id.

Plaintiffs allege that they stopped making payments when Weitsman received a voice message from a shipping company driver who claimed to have delivered Northeastern scrap to Plaintiffs.  Id.  In the message, the driver claimed that the drivers had orders from Northeastern to pay Plaintiffs' employees to under-record the amount of dirt in Northeastern's shipments.  Id. Plaintiffs contacted the Federal Bureau of Investigation ("FBI"), which began an investigation into the matter.  Id.  The FBI directed Weitsman to meet with Northeastern representatives wearing a

3

wire.  Id.  The FBI suggested that Weitsman get Northeastern to resume shipments.  Id. at 3-4.

Plaintiffs commenced this action on June 21, 2012, Compl., and following discovery, the parties moved for summary judgment on all claims.  Dkt. Nos. 25; 31.  In the September Order, the Court found that Defendants had made a *prima facie* case for breach of contract because it was undisputed that Plaintiffs did not make payments for all shipments after July 2011.  Sept. Order at 5. Plaintiffs asserted that Defendants' bad faith conduct excused Plaintiffs' nonperformance under the contract, but the Court found that Plaintiffs did not raise a genuine issue of material fact regarding bad faith because they failed to offer any admissible evidence.  Id. at 6-7.  Accordingly, the Court granted summary judgment in favor of Defendants on all of Plaintiffs' claims against Defendants and on Defendants' breach of contract claim against Plaintiffs.  Id. at 9.  Defendants' breach of contract claim against Weitsman was dismissed.  Id.

Following the September Order, Defendants moved for an award of damages consistent with the Order.  Dkt. No. 40.  On December 29, 2014, the action was reassigned to the Honorable Brenda K. Sannes, U.S. District Judge.  Dkt. No. 44.  In December 2014, Plaintiffs' counsel was informed by the United States Attorney's Office for the Northern District of New York that the FBI's investigation was closed.  Dkt. No. 51-1 ¶ 3.  During the investigation, the FBI had declined to disclose details of the investigation to Plaintiffs.  Dkt. No. 104-1 ("Devendorf Cross-Motion Declaration") ¶ 7. Accordingly, on December 31, 2014, Plaintiffs submitted a subpoena to the FBI for the production of materials from the investigation.  Id. ¶ 4.  In February 2015, after the Court denied Defendants' Motion to quash the subpoena, Dkt. No. 55, the FBI produced certain materials.[4]

_____

[4] The materials produced by the FBI are subject to a Protective Order.  Dkt. No. 58 ("Protective Order").

Dkt. No. 91-1 ("Devendorf Reconsideration Declaration") ¶ 17.[5]

Upon receipt of the FBI materials, Plaintiffs submitted a Letter Request to adjourn the trial on damages and to conduct an investigation as to the subpoenaed materials. Dkt. No. 59. Defendants opposed that request. Dkt. No. 60. On April 14, 2015, the parties appeared before Judge Sannes for a hearing ("April Hearing") regarding Plaintiffs' request to adjourn the trial. See Text Minute Entry (Apr. 14, 2015); see also Dkt. No. 98-2 ("Transcript"). At the conference, Plaintiffs argued that there were outstanding FBI materials that they had not received. Tr. at 3:20-23. Plaintiffs also argued that the FBI investigation, while ongoing, had impeded their ability to contact and depose certain witnesses. Id. at 10:4-9. Based on Plaintiffs' representations, Judge Sannes adjourned the damages trial and allowed Plaintiffs to conduct additional discovery and depositions of witnesses who either were unavailable because of the FBI investigation or whose identities were not previously known. Id. at 23:25-24:8; see also Text Minute Entry (Apr. 14, 2015).

In May 2015, the FBI produced additional documents. See Dkt. No. 65. In July 2015, Plaintiffs conducted depositions of Peter Wangler ("Wangler") and Aaron Posner ("Posner"). Devendorf Recons. Decl. ¶ 36; see also Dkt. Nos. 91-16 ("Posner Deposition"); 91-17 ("Wangler Deposition"). Plaintiffs also conducted depositions of two former employees of Northeastern, Richard G. Cross ("Cross, Sr.") and Richard S. Cross ("Cross, Jr."). Devendorf Recons. Decl. ¶ 26. Defendants moved to prevent the deposition of Cross, Sr. on the ground that he was an individual known by all parties before the close of discovery. Dkt. No. 72. Judge Sannes denied Defendants'

_____

[5] The Devendorf Reconsideration Declaration was filed with the Court under seal. Dkt. No. 93.

Motion and permitted Cross, Sr.'s deposition. Text Minute Entry (June 30, 2015). Judge Sannes also permitted Defendants to take Weitsman's deposition and Plaintiffs to serve Defendants with supplemental interrogatories. Id.; Dkt. No. 79.

On July 21, 2015, Judge Sannes filed an Order of Recusal and this action was reassigned to the Court. Dkt. No. 89. On July 27, 2015, Plaintiffs filed their Motion for reconsideration. Mot. Recons. Defendants then filed Motions to preclude evidence, for sanctions, and to enforce the protective order, and Plaintiffs cross-moved for attorneys' fees. Mot. Preclude; Pls. Cross-Mot.; Mot. Sanctions; Mot. Enforce Prot. Order.

## III. DISCUSSION

### A. Rule 11 Motion and Motion to Preclude Evidence

Because Defendants' Motion for sanctions and Motion to preclude evidence involve common issues of fact, the Court addresses them together. Claiming that Plaintiffs made misrepresentations at the April 14, 2015 hearing that led the Court to reopen discovery, Defendants request that the Court preclude all evidence that the Plaintiffs obtained after the reopening of discovery. Mot. Preclude Mem. at 14. In addition, Defendants request attorneys' fees and costs they incurred from the reopening of discovery. Id. at 15. Defendants also filed a Motion for sanctions pursuant to Rule 11 and 28 U.S.C. § 1927. Mot. Sanctions.

#### 1. Legal Standard

Under Rule 11(b)(3), an attorney presenting "a pleading, written motion, or other paper" to a court must certify "to the best of [their] knowledge, information, and belief" that "the factual contentions have evidentiary support." FED. R. CIV. P. 11(b)(3). The appropriateness of sanctions under Rule 11 is determined by "an objective standard of reasonableness." United States v. Int'l

Bhd. of Teamsters, Chauffers, Warehousemen & Helpers of Am., AFL-CIO, 948 F.2d 1338, 1344 (2d Cir. 1991). A particular factual contention is subject to sanctions where it is "utterly lacking in support." Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 388 (2d Cir. 2003) (quoting O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996)). "[A]n attorney is entitled to rely on the objectively reasonable representations of the client." Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1329-30 (2d Cir. 1995).

When ruling on a motion for Rule 11 sanctions, a district court "must adhere to the procedural rules which safeguard due process rights." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 58 (2d Cir. 2000). Rule 11 requires that a motion for sanctions be filed as a separate motion and describe the specific conduct that allegedly violates Rule 11(b). FED. R. CIV. P. 11(c)(2). Furthermore, Rule 11 contains a "safe harbor" that requires a party seeking sanctions to first provide the opposing party with formal notice of their intent to seek sanctions. Id. The opposing party then has twenty-one days to withdraw or appropriately correct the potentially offending statements before the Rule 11 motion can be filed with the court. Id. The purpose of the safe harbor is to encourage parties to abandon questionable contentions by allowing them to avoid sanctions with the timely withdrawal of meritless claims. FED. R. CIV. P. 11; Adv. Comm. Notes, 1993 Amend. Rule 11 motions "have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." In re Pennie & Edmonds LLP, 323 F.3d 86, 89 (2d Cir. 2003).

Under 28 U.S.C. § 1927, an attorney "who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The

imposition of sanctions under § 1927 requires a "clear showing of bad faith." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986) (quoting Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1010 (2d Cir. 1986)). "[A]n award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Id.

Additionally, courts have inherent power to sanction bad faith conduct. Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1981). A court may assess attorneys' fees and costs "where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Int'l Bhd. of Teamsters, 948 F.2d at 1345 (internal quotation marks omitted). There must be "a particularized showing of bad faith to justify the use of the court's inherent power." Id. Generally, where conduct may be "adequately sanctioned" under Rule 11 or § 1927, a court should apply sanctions under those provisions; however, where conduct would not be adequately sanctioned by Rule 11 or § 1927, "the court may safely rely on its inherent power." Chambers, 501 U.S. at 50.

### 2. Analysis

Defendants' Motion to preclude evidence and Motion for sanctions are both based on the same underlying conduct, which the Court summarizes here. Defendants' assertions center on Plaintiffs' representations at the April Hearing and Judge Sannes' ruling to reopen discovery on a limited basis due to Plaintiffs' representations.

Defendants first argue that Plaintiffs misrepresented that the FBI directed Plaintiffs to not contact certain witnesses. Mot. Preclude Mem. at 4-6. At the hearing, Plaintiffs' counsel referred to a "directive from the FBI that there is an open investigation" and that Plaintiffs were to "stand down." Tr. at 8:20-23. Plaintiffs stated that they "were dealing with the FBI telling [them] don't

8

. . . go into Canada . . . and basically to stand down in terms of any effort that [they] might make."
Id. at 10:4-9. Relying on Plaintiffs' representations, Judge Sannes stated that "[a]s I understand the
[P]laintiffs' claims, they were told to stand down with respect to discovery . . . because of the FBI
investigation" and ruled that "[n]ow that the FBI investigation is completed, I would be inclined to
give them some amount of time to subpoena those witnesses at trial or take their deposition." Id. at
23:25-24:7.

Defendants argue that Plaintiffs' representations were false, relying on the Declaration of
FBI agent John P. Bokal, Jr. ("Agent Bokal"), dated July 9, 2015. Mot. Preclude Mem. at 8-9; see
also Dkt. No. 98-4 ("Bokal Declaration"). Agent Bokal was in charge of the FBI investigation.
Dkt. No. 104-3 ("Perticone Declaration") ¶ 3. In his Declaration, Bokal states that "[a]t no time did
I tell council [sic] for the plaintiffs, council [sic] for the defendants or anyone involved in the civil
suit between Northeastern Ferrous, Inc. and Upstate Shredding LLC, Weitsman Shredding and
Adam Weitsman what witnesses could or could not be contacted." Bokal Decl. ¶ 3.

In response to Defendants' assertions, Plaintiffs' counsel filed Declarations, which clarify
their statements at the April Hearing. See Dkt. No. 104-2 ("Johnson Declaration"); Devendorf
Cross-Mot. Decl.; Perticone Decl. Plaintiffs' counsel John L. Perticone ("Perticone") states that
over the course of the investigation, he periodically asked Agent Bokal to disclose witness
identities, tape recordings, and any other information that could be relevant to Plaintiffs' action
against Defendants, but Agent Bokal denied all such requests because the investigation was
ongoing. Perticone Decl. ¶ 13. Perticone "believed that Special Agent Bokal would not have
refused to provide information and evidence unless he believed that the investigation would be
jeopardized." Id. ¶ 19. Additionally, Weitsman was cooperating with the FBI investigation and

Bokal "would tell [him] who to talk to." Dkt. No. 91-20 ("Weitsman Deposition") at 102:25. After talking with Wangler on the phone, Weitsman was instructed by Bokal not to go to Canada to meet with Wangler in person. Johnson Decl. ¶ 6(k). Accordingly, Plaintiffs were "careful so as not to interfere with the ongoing investigation." Perticone Decl. ¶ 18. Perticone's statements concerning Plaintiffs' understanding of the FBI investigation are echoed by Johnson and Devendorf. Johnson Decl. ¶ 10 ("[Plaintiffs] in good faith believed that the FBI was opposed to any attempt by plaintiffs and their counsel to contact and interview any potential nonparty witnesses located in Canada."); Devendorf Decl. ¶ 25 ("[T]he statements that were made by Agent Bokal about the investigation gave [Plaintiffs] the clear understanding that they could not conduct an independent investigation that would interfere with the FBI's investigation."). In their Motion for sanctions, Defendants claim that the Johnson and Devendorf Declarations establish that Plaintiffs' statements at the April Hearing were false. Mot. Sanctions Mem. at 10-14.

Defendants also argue that Plaintiffs misrepresented that they did not have contact information for Sher-Singh Bains ("Bains"), a former truck driver for Ontario Trucking. Mot. Preclude Mem. at 3-4. Judge Sannes asked Plaintiffs if they had sought to depose Bains during discovery because they had his identity and had met with him. Tr. at 7:23-8:3. Plaintiffs stated that they did not have his full identity and contact information—all they had was a cell phone number and a last name—and that Weitsman had only met with him for "a minute or two." Tr. at 8:4-8:19. Defendants argue that recordings submitted in support of Plaintiffs' Motion for reconsideration contradict Plaintiffs' representation that Weitsman had only met with Bains for "a minute or two." Mot. Preclude Mem. at 10-12. The recordings, Defendants assert, demonstrate that Weitsman met with Bains for approximately one hour in July 2011, not "a minute or two." Id.

The Court finds that Defendants have failed to show that either preclusion of the depositions taken after the close of discovery or that any other sanction is appropriate.[6]

The Court first observes that Defendants' assertions center on Plaintiffs' oral representations at the April Hearing. Rule 11 applies to "pleading[s], written motion[s], or other paper[s]," which an attorney "present[s] . . . by signing, filing, submitting, or later advocating." FED. R. CIV. P. 11(b). As the Advisory Committee explained, "[t]he rule applies only to assertions contained in papers filed with or submitted to the court. . . . However, a litigant's obligations with respect to the contents of these papers are not measure solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions." Adv. Comm. Notes, 1993 Amend. Thus, "not all oral statements are sanctionable under Rule 11, even when they advance baseless allegations." O'Brien, 101 F.3d at 1489. In order to be subject to Rule 11, "the oral statement must relate directly to a particular representation contained in the document that the lawyer is then advocating." Id. at 1490; see also Nike, Inc. v. Top Brand Co., 216 F.R.D. 259, 275 (S.D.N.Y. 2003) ("[R]epresentations made by counsel in conferences, before the court, even if inaccurate, are not subject to Rule 11 sanctions unless presented in conjunction with an offending filing."). Aside from Plaintiffs' representations at the April Hearing, the only written filings that Defendants cite to are a letter dated June 26, 2015, a letter dated June 30, 2015, and the Devendorf and Johnson Declarations. Mot. Preclude Mem. at 7-8; Mot. Sanctions Mem. at 10-14.

---

[6] The Court notes that Defendants' Motion to preclude does not identify the rule or statute under which Defendants seek preclusion of the depositions. The Motion seeks sanctions—preclusion of the depositions and attorneys' fees—based on Plaintiffs' alleged misrepresentations. However, Defendants deny that the Motion is brought under Rule 11 and did not comply with Rule 11's safe harbor provision. Dkt. No. 109-2. Accordingly, the Court construes the Motion as appealing to the Court's inherent power to impose sanctions.

Furthermore, Defendants do not argue that the Devendorf and Johnson Declarations contain false statements, but rather that they prove that Plaintiffs' statements at the April Hearing were false. See Mot. Sanctions Mem. at 10-14. Thus, the only written filings by Plaintiffs that Defendants identify as containing misrepresentations are the two letters filed after the April Hearing. In those letters, Plaintiffs represent that the FBI instructed them not to contact Wangler. Dkt. No. 73. Since the letters were filed after the April Hearing, Defendants have not shown that Plaintiffs were advocating a representation contained in a written document at the April Hearing. Accordingly, Plaintiffs' statements at the April Hearing are not subject to Rule 11.

Moreover, the Court finds that Defendants have failed to show that Plaintiffs' statements at the April Hearing are sanctionable misrepresentations. Defendants contend that Plaintiffs misrepresented that there was a "mandate" or "directive" from the FBI not to pursue certain discovery. Defendants rely on Agent Bokal's statement that he never told Plaintiffs not to contact or depose any witness. Mot. Sanctions Mem. at 5. However, Agent Bokal's statement does not contradict Plaintiffs' assertions which provide a factual basis for their representations to the Court. It is undisputed that Plaintiffs were cooperating with an ongoing FBI investigation. Weitsman, in particular, followed Agent Bokal's directions. Agent Bokal stated that he was in charge of the investigation, and "would tell [Weitsman] specifically if he wanted [Weitsman] to contact a witness" and "who to talk to, where to meet, what wire to wear." Weitsman Dep. at 102:9-12, 102:25-103:1. At Agent Bokal's directions, Weitsman met with Goldblatt wearing a wire, and convinced him to resume shipments. Sept. Order at 3-4. Weitsman was directed to not meet with Wangler. Johnson Decl. ¶ 6(k). Additionally, Plaintiffs' counsels' requests for information regarding the FBI investigation were uniformly denied. Perticone Decl. ¶ 16. Thus, Plaintiffs argue

that they had a good faith basis for their understanding that they were on "stand down" and could not interfere with the FBI investigation. Pls. Cross-Mot. Mem. at 19.

Defendants argue that there is a fundamental difference between what Plaintiffs now assert—that they declined to pursue depositions in Canada because of a good faith belief that doing so would have interfered with the FBI investigation—and their representation at the April Hearing that the FBI directed them not to contact certain witnesses in Canada. See Mot. Sanctions Mem. at 6-9. The Court does not agree that Plaintiffs' statements at the April Hearing misrepresent Plaintiffs' interactions with the FBI. Defendants cite the following statements by Plaintiffs' counsel, which Defendants claim are inaccurate:

- "[T]he directive from the FBI that there is an open investigation, stand down, don't pursue that information . . ." (Tr. at 8:20-24).
- "[T]he real problem is the FBI mandate of we're doing an investigation, there is a criminal investigation that is underway, which was ultimately the biggest impediment." (Tr. at 9:15-18).
- "[W]e didn't make efforts to try to investigate that further because at all times we were dealing with the FBI telling us don't you go into Canada, don't you interfere with the investigation, you know, we're in charge of this now, and basically to stand down in terms of any effort that we might make." (Tr. at 10:4-9).
- "Literally up until December of 2014 we were on a stand down in terms of these people in Canada as far as the FBI was concerned." (Tr. at 11:14-16).
- "We were instructed by the FBI, as we were continuously through this process, don't you try to do anything, stand down, we're taking care of this." (Tr. at 16:2-6).

All of these statements have a foundation in Plaintiffs' assertions that Weitsman was directed by Agent Bokal to contact certain witnesses and not contact others and that Agent Bokal refused to provide any information concerning the investigation. Plaintiffs reasonably believed that they could not interfere with the FBI investigation and represented such at the April Hearing. Defendants argue that Plaintiffs' language represented that Plaintiffs had received express directions not to contact certain witnesses; however, Plaintiffs' statements are consistent with what Weitsman heard from

Agent Bokal, that the FBI was in charge of the investigation and that Weitsman was only to talk to witnesses at Agent Bokal's directions.

The Court also finds that to the extent that Plaintiffs misstated the length of their meeting with Bains—stating that the meeting was "a minute or two" when it was in fact approximately one hour—that was not a material misrepresentation. Plaintiffs represented that they only knew Bains' cell phone number, did not know his first name or his address, and that Weitsman only met Bains once, in an FBI monitored meeting. The length of Weitsman's meeting with Bains—whether one or two minutes or approximately one hour—is immaterial to Plaintiffs' representation that they did not have full contact information for Bains.

Accordingly, Defendants' Motion to preclude evidence and Motion for sanctions are denied.

**B. Plaintiffs' Cross-Motion for Attorneys' Fees**

Plaintiffs cross-move pursuant to Federal Rule of Civil Procedure 37, for attorneys' fees and costs incurred as a result of Defendants' failure to disclose certain witnesses. Pls. Cross-Mot. Plaintiffs also argue that Defendants' Motion for sanctions was filed in bad faith and that they should be entitled to recover their expenses from responding to that Motion. Dkt. No. 115-1 ("Plaintiffs Response – Motion for Sanctions") at 23-25.[7]

Under Rule 37, a court may order a party who fails to comply with their discovery obligations without "substantial justification" to pay "reasonable expenses, including attorney's fees." FED. R. CIV. P. 37(d)(3); see also Tse v. UBS Fin. Servs., Inc., 568 F. Supp. 2d 274, 321-22 (S.D.N.Y. 2008) (listing cases where courts awarded attorneys' fees for incomplete discovery

---

[7] Plaintiffs' Memorandum of law in support of their Response to Defendants' Motion for sanctions was filed with the Court under seal. Dkt. No. 118.

responses).  "Sanctions are appropriate '[w]hen a party seeks to frustrate [discovery] by preventing disclosure of facts essential to an adjudication on the merits.'" Tse, 568 F. Supp. 2d at 321 (quoting Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991) (alteration in original)).  "[C]onduct is substantially justified if there was a 'genuine dispute' or if 'reasonable people could differ' as to the appropriateness of the contested action."  Underdog Trucking, L.L.C. v. Verizon Servs. Corp., 273 F.R.D. 372, 377 (S.D.N.Y. 2011).  The award of attorneys' fees and costs pursuant to Rule 37 is within the court's discretion.  Jockey Int'l, Inc. v. M/V "LEVERKUSEN EXPRESS", 217 F. Supp. 2d 447, 452 (S.D.N.Y. 2002).

Plaintiffs assert that Defendants did not fully and truthfully answer Plaintiffs' discovery requests in an effort to conceal the identities of witnesses.  Specifically, Plaintiffs requested that Defendants

- "State where and by whom were the scrap materials loaded onto the trucks of Ontario Trucking for delivery to plaintiffs, and what equipment was used in the loading process."  Dkt. No. 91-13 ("Defendants' Response to Plaintiffs' First Set of Interrogatories") ¶ 9.
- "Identify by name, position and job duties all employees of Northeastern Ferrous, Inc., who were involved in the sale, preparation and shipping of scrap materials to the plaintiffs."  Id. ¶ 13.

In response to interrogatory nine, Defendants stated that they were "not able to state, with certainty, the identity of the individuals that personally loaded materials onto trucks destined for delivery to the plaintiffs," and did not identify any individuals.  Id. ¶ 9.  In response to interrogatory thirteen, Defendants again stated that they were unable to identify with certainty the individuals involved in the sale and shipment of scrap metal to Plaintiffs, but identified Goldblatt, Dave Laidlow ("Laidlow"), and Heather Lalonde.  Id. ¶ 13.  Plaintiffs claim that they were prejudiced by Defendants' failure to disclose the individuals—in particular, Cross, Sr. and Cross, Jr.—involved in

15

loading the trucks that went to Plaintiffs.  Pls. Cross-Mot. Mem. at 13-14.

Defendants explain that their answers were truthful because Northeastern made scrap shipments to companies other than Upstate and could not state with certainty which individuals were involved in loading shipments to Upstate.  Dkt. No. 108-2 ("Defendants Reply – Cross-Motion") at 4.  Defendants further argue that they identified the individual who oversaw the operations of the scrap yard, Laidlow.  Id.  Plaintiffs elected not to depose Laidlow.  Id. at 5.

The burden is on the party answering interrogatories "to make an inquiry and obtain information to answer the interrogatories which would include obtaining the information to fully and completely answer the interrogatories from" from former employees of that party.  Nat'l Fire Ins. Co. of Hartford v. Jose Trucking Corp., 264 F.R.D. 233, 239 (W.D.N.C. 2010); see also Zanowic v. Reno, No. 97Civ.5292, 2000 WL 1376251, at *3 n.1 (S.D.N.Y. Sept. 25, 2000) ("In responding to interrogatories . . . a party is under a duty to make a reasonable inquiry concerning the information sought in the interrogatories, and a party's failure to describe his efforts to obtain the information sought . . . renders his responses insufficient.").  The Court accordingly finds Defendants' response to interrogatories nine and thirteen inadequate.  It was Defendants' burden, not Plaintiffs, to inquire of their employee, Laidlow, what individuals loaded trucks bound to Plaintiffs.  See Dkt. No. 91-25 ("Goldblatt Deposition") at 56-57 (stating that Laidlow was manager of scrap yard and still employed by Northeastern in November 2013).  Defendants' responses do not identify any individuals who loaded trucks bound for Plaintiffs' facility and do not detail any efforts to obtain such information.

Nonetheless, the Court does not find that sanctions are appropriate.  Plaintiffs did not move to compel Defendants to provide more specific answers to their interrogatories, when those answers

16

were served in September 2013. Indeed, Plaintiffs argued that Defendants had not disclosed Cross, Sr. and Cross, Jr. as early as June 2015, but did not move for attorneys' fees and costs based on the sufficiency of Defendants' interrogatory responses until they responded to Defendants' own motion for sanctions, in September 2015. See Dkt. No. 73. Based on the untimely nature of Plaintiffs' Motion, the Court declines to impose sanctions pursuant to Rule 37(d) for conduct that occurred more than two years ago.

Plaintiffs also assert that Defendants acted in bad faith to delay the depositions of Cross, Sr. and Cross, Jr., causing Plaintiffs significant costs. Pls. Cross-Mot. Mem. at 14-16. Specifically, Plaintiffs assert that Defendants waited until the day of Cross, Sr.'s deposition to file a Motion for a protective order, causing the deposition to be adjourned, even though Plaintiffs' counsel had traveled to Canada. Id. at 14-15. However, the record shows that Defendants' Motion was not filed in bad faith. On June 26, 2015, Plaintiffs served notice of their intent to depose Cross, Sr. on June 30. Dkt. No. 72-1 ¶ 13. Defendants had already objected to Cross, Sr.'s deposition on June 24, and repeated those objections in a letter and by phone on June 29. Id. ¶¶ 28-29. The parties did not reach an agreement, but Defendants understood that the deposition would be adjourned and presented to the Court for resolution. Id. ¶ 33. However, in a email sent at 12:02 a.m. on June 30, Plaintiffs' counsel informed Defendants that they intended to proceed with the deposition and noted that Defendants had not sought a protective order. Id. ¶ 34. Defendants then filed their Motion for a protective order on June 30. Dkt. No. 72. Thus, the Court finds that Defendants did not unreasonably delay filing their Motion; Defendants conferred with Plaintiffs in good faith, as required by Rule 26(c), and believed that the deposition would be adjourned, until Plaintiffs declared their intent to proceed with the deposition unless Defendants filed a motion for a protective

order.  Plaintiffs next contend that Defendants' Motion caused additional scheduling conflicts.  Pls. Cross-Mot. Mem. at 15.  However, the conflicts were due to Cross, Sr.'s work schedule, not Defendants.  Id.  Finally, Plaintiffs accuse Defendants of contacting Cross, Sr. before the deposition and telling him that he did not have to appear.  Id.  The Court does not find that the evidence of Defendants' phone call to Cross, Sr. compels the imposition of sanctions.

Plaintiffs additionally argue that Defendants' Motion for sanctions was filed in bad faith because it addresses the same conduct as Defendants' Motion to preclude and Defendants could have raised their Rule 11 arguments in that Motion.  Pls. Resp. – Mot. Sanctions at 24-25.  Plaintiffs contend that Defendants' Rule 11 Motion was filed for tactical purposes.  Id.

"If warranted, the court may award to the prevailing party [on a Rule 11 motion] the reasonable expenses, including attorney's fees, incurred for the motion."  FED. R. CIV. P. 11(c)(1).  "Requests for sanctions seek court orders and are, therefore, subject to the same Rule 11 analysis as all other motions."  Nakash v. U.S. Dep't of Justice, 708 F. Supp. 1354, 1368 (S.D.N.Y. 1988).  "A request for sanctions under Rule 11 is not a tactical device."  Id. at 1370; see also Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 101 F. Supp. 2d 236, 246 (S.D.N.Y. 2000).

While Defendants' arguments in its Rule 11 Motion are well-founded, the Court agrees with Plaintiffs that the Motion is duplicative and does not further the litigation.  The Rule 11 Motion complains of exactly the same conduct as the Motion to preclude.  Compare Mot. Sanctions, with Mot. Preclude.  The only new conduct asserted by Defendants consists of the Declarations filed in support of Plaintiffs' Response to the Motion to preclude; however, Defendants do not argue that the Declarations themselves contain misrepresentations, but rather that they are evidence that Plaintiffs' statements at the April Hearing were false.  See Mot. Sanctions Mem. at 10-14.  As

Plaintiffs argue, Defendants clearly could have raised their Rule 11 arguments in the Motion to preclude. Pls. Resp. – Mot. Sanctions at 24. The Bokal Affidavit—which is the basis of Defendants' Rule 11 Motion and Motion to preclude—is dated July 10, 2015. Bokal Aff. Defendants could have filed their Rule 11 Motion, allowing for the twenty-one day safe harbor period, anytime thereafter. Defendants filed their Motion to preclude on August 18, but did not file their Motion for sanctions until October 7. Accordingly, the Court awards Plaintiffs reasonable attorneys' fees and costs of responding to Defendants' Motion for sanctions. Plaintiffs shall submit an affidavit supporting its attorneys' fees and expenses in responding to Defendants' Motion for sanctions within ten (10) days of this Memorandum-Decision and Order. Defendants may file a response no later than seven (7) days after Plaintiffs file their affidavit.

### C. Motion for Reconsideration

Plaintiffs move for reconsideration of the September Order and to reopen discovery on the basis of the Cross, Sr., Cross, Jr., Wangler, and Posner Depositions, and the FBI materials. Mot. Recons. Defendants claim that Plaintiffs' Motion is untimely and is either based on evidence that is not new or is inadmissible. Defs. Resp. Mem. – Mot. Recons.

#### 1. Legal Standard

A motion for reconsideration may be granted where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). When newly discovered evidence is the basis for reconsideration, 'the proponent must demonstrate that the newly discovered evidence was

neither in his possession nor available upon the exercise of reasonable diligence at the time the interlocutory decision was rendered." In re Rezulin Prods. Liab. Litig., 224 F.R.D. 346, 350 (S.D.N.Y. 2004); see also Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., No. 88 Civ. 9127, 1992 WL 296314, at *3 (S.D.N.Y. Oct. 6, 1992) (stating that the test for "new evidence" on a motion for reconsideration is the same as on a motion brought under Federal Rule of Procedure 60(b)(2)). "The standard for granting a motion for reconsideration 'is strict and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc., 751 F. Supp. 2d 348, 382-83 (N.D.N.Y. 2010) (Kahn, J.) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)). "[R]econsideration 'should not be granted where the moving party seeks solely to relitigate an issue already decided.'" Id. at 383 (quoting Shrader, 70 F.3d at 257).

   *2. Timeliness*

   Local Rule 7.1(g) requires that a motion for reconsideration be filed "no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree." N.D.N.Y. L.R. 7.1(g). The September Order was filed September 30, 2014; Plaintiffs' Motion was filed on July 27, 2015. Sept. Order; Mot. Recons. Plaintiffs' Motion therefore is untimely. However, the Court will not deny the Motion for untimeliness. Plaintiffs informed Judge Sannes at the April Hearing that they believed the FBI materials would support a motion for reconsideration. Tr. at 4:9-11. Judge Sannes subsequently set and extended deadlines for Plaintiffs to file a motion for reconsideration based on the FBI materials. See Text Minute Entry (July 20, 2015); Dkt. No. 87. Accordingly, the Court will consider Plaintiffs' Motion on the merits.

*3. Analysis*

Plaintiffs rely on the following new evidence: (1) the depositions of Cross, Sr. and Cross, Jr., Northeastern employees who loaded trucks bound for Upstate; (2) the depositions of Wangler and Posner, non-party witnesses; and (3) the FBI materials. Pls. Recons. Mem. Plaintiffs argue that this new evidence establishes Defendants' bad faith and is sufficient to reinstate Plaintiffs' claims for breach of contract and fraud. Id. at 22-23. The Court first considers whether Plaintiffs newly offered evidence qualifies as "new evidence." The Court also considers the admissibility of the FBI materials. Finally, to the extent that Plaintiffs have offered any admissible, "new evidence," the Court considers whether that evidence warrants reconsideration of the September Order.

1. New Evidence

Defendants assert that Plaintiffs were aware of Cross, Sr., Wangler, and Posner during discovery and made a tactical decision not to pursue these witnesses.[8] Defs. Resp. Mem. – Mot. Recons. at 12-13. Defendants also assert that the evidence in the FBI materials was available to Plaintiffs because they were aware of Ontario Trucking. Id. at 20-21. Defendants therefore argue that Plaintiffs did not exercise reasonable diligence and that the testimony of these witnesses and the evidence of the FBI materials is not new evidence sufficient to support a motion for reconsideration.

*i. Cross, Sr.*

Defendants assert that Plaintiffs themselves identified Cross, Sr. as a witness with personal knowledge of the loading of trucks with dirt and non-metal debris to Upstate. Defs. Resp. Mem. – Mot. Recons. at 14-15. Defendants cite Plaintiffs' response to Northeastern's second set of interrogatory requests, dated December 13, 2013, which identifies "Richard Cross," "upon

_____

[8] Defendants do not argue that Cross, Jr.'s deposition is not new evidence.

21

information and belief" as an individual with "personal knowledge" of the allegations that shipments from Northeastern to Upstate contained "amounts of dirt and non-metal debris in excess of the amounts that were recorded and deducted on the delivery Tickets." Id. at 15-16. Accordingly, Defendants assert that Plaintiffs had the opportunity to depose Cross, Sr. and made a deliberate decision not to take his deposition.

Plaintiffs argue that Defendants misrepresent Plaintiffs' knowledge of Cross, Sr. Pls. Reply – Mot. Recons. at 4-5. Plaintiffs claim that they only became aware of Cross, Sr. after he was disclosed in Goldblatt's deposition, which was only twenty days before the close of discovery. Id. at 4; Dkt. No. 102-2 ¶ 14; see also Goldblatt Dep. at 64:3-4. Goldblatt only mentioned Cross, Sr. as a "shear operator" and thus Plaintiffs claim that they only identified him as an individual with personal knowledge of the loading of trucks bound for Upstate upon "information and belief." Pls. Reply – Mot. Recons. at 4. Additionally, Plaintiffs argue that the reason they were unaware of Cross, Sr. was Defendants' inadequate disclosures in response to Plaintiffs' interrogatories. Id.

The Court agrees that Plaintiffs would not have been aware of Cross, Sr.'s role with Northeastern with the exercise of reasonable diligence. Cross, Sr. was responsive to Plaintiffs' discovery request for the names of individuals who loaded trucks bound for Upstate, but was not disclosed by Defendants. As the Court discussed *supra*, Defendants had the burden to make a reasonable inquiry to obtain information to answer Plaintiffs' interrogatories. See Nat'l Fire Ins., 264 F.R.D. at 239. Plaintiffs were not required—as Defendants argue, Defs. Resp. – Mot. Recons. at 13 n.6—to file a motion to compel or assume that Defendants were withholding information. See Kettenbach v. Demoulas, 901 F. Supp. 486, 495 (D. Mass. 1986) (stating that the "failure to make full use of discovery does not require a finding of lack of due diligence"). Although Plaintiffs

otherwise became aware of Cross, Sr., they were not aware that he loaded trucks bound for Upstate. Where a party is aware of an individual, but does not know that the individual possesses certain information, it does not evidence a lack of diligence if they fail to contact that individual. See Hornor, Townsend & Kent, Inc. v. Hamilton, No. Civ.A.1:01 CV 2979, 2004 WL 2284503, at *7 (N.D. Ga. Sept. 30, 2004); cf. Hall v. Daka, Int'l, Inc., 172 F.R.D. 19, 22 (N.D.N.Y. 1997) (finding that affidavit was not new evidence where party was aware of witness and information that they possessed); see also United States v. Potamkin Cadillac Corp., 697 F.2d 491, 493 (2d Cir. 1983).[9]

Accordingly, the Court finds that the Cross, Sr. deposition is new evidence.[10]

### ii. Wangler

Plaintiffs assert that before the September Order they did not have any information about Wangler other than his telephone number, a belief as to the spelling of his name, and a statement that he had information on the loading of contaminants into trucks bound for Upstate. Pls. Recons. Mem. at 15-16. Defendants argue that Plaintiffs had the ability to obtain Wangler's testimony throughout the lawsuit. Defs. Resp. Mem. – Mot. Recons. at 18-19. Plaintiffs spoke to Wangler in February 2013. Dkt. No. 97-3 ("Plaintiffs' Response to Defendants' Second Set of Interrogatories") at 6-7. Plaintiffs also identified Wangler as an individual with personal knowledge of how dirt and non-metal debris were loaded on trucks bound for Upstate. Id. at 4. Plaintiffs argue in response that the FBI investigation impeded their ability to contact Wangler. Pls. Reply – Mot. Recons. at 6.

---

[9] The Court also notes that Defendants presented the same arguments that Plaintiffs were aware of Cross, Sr. before the September Order in their Motion for a protective order. See Dkt. No. 72 ¶¶ 22-23. Judge Sannes rejected these arguments and allowed the Cross, Sr. deposition to proceed. Text Order (June 30, 2015).

[10] For the same reasons, the Court also finds that Cross, Jr.'s deposition constitutes new evidence.

Although the Court found that Plaintiffs did not misrepresent their belief that they were precluded from contacting certain witnesses, it finds that Plaintiffs were not diligent in pursuing Wangler's testimony. Plaintiffs had Wangler's phone number and knew that he possessed information of how dirt and non-metal debris were loaded on trucks bound for Upstate. Plaintiffs did not contact him based on their belief that doing so would interfere with the FBI investigation. However, Plaintiffs never confirmed that contacting Wangler would interfere with the FBI's investigation, either by seeking permission from the FBI—as they did before conducting depositions of their own employees, Perticone Decl. ¶ 14—or attempting to contact Wangler.

Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300 (11th Cir. 2003), is instructive. In that case, the plaintiffs sought to introduce the testimony of a criminal defendant after summary judgment had been granted in the plaintiffs' civil case. Waddell, 329 F.3d at 1309. The plaintiffs had earlier obtained a statement from the defendant, but when they attempted to depose him, he invoked his Fifth Amendment rights. Id. at 1310. The plaintiffs did not seek to extend discovery or stay the proceedings until after the criminal trial. Id. The court found that because the plaintiffs "never indicated dissatisfaction" with the statement they had, they could not, after the entry of summary judgment, "persuasively complain that [the defendant] had additional evidence of which they were unaware and which might have helped them to avoid summary judgment." Id.; see also Betterbox Commc'ns LTD v. BB Techs., Inc., 300 F.3d 325, 332 (3d Cir. 2002) (finding that party was not diligent where it "did not attempt to depose or subpoena anyone from the PTO" and stating that even though it was likely "that the PTO would have refused to provide any evidence . . . the fact remains that [the party] did not take the obvious steps that would have demonstrated this").

Thus, a party who claims that the witness is unavailable must take affirmative steps to obtain

that witness' testimony, including moving to extend discovery or stay the proceedings, in order to demonstrate diligence. See Washington v. Patlis, 916 F.2d 1036, 1038 (5th Cir. 1990) (finding that plaintiff did not evidence due diligence where she knew of witness and substance of testimony, but did not move for a continuance in order to locate that witness). Plaintiffs were aware of Wangler and the information he possessed, but did not confirm that he was unavailable due to the FBI investigation and did not seek to extend discovery or stay the proceedings.

### iii. Posner

Plaintiffs claim that they were unaware of Posner prior to the September Order. Pls. Recons. Mem. at 15. Defendants argue that, as with Wangler, Plaintiffs had talked to Posner by phone before the September Order. Defs. Resp. Mem. – Mot. Recons. at 22.

Posner's testimony indicates that he spoke to Plaintiffs in 2011 regarding a conversation he had with Gurdayal Madesha ("Goldie"), who owned Ontario Trucking, the trucking company that made deliveries to Upstate. Dkt. No. 91-16 ("Posner Deposition") at 19:20-23, 45:5-7, 46:10-13. Thus, like Wangler, Plaintiffs were aware of Posner and the substance of the information he possessed prior to the September Order. Plaintiffs do not offer any additional reasons for why they did not contact Posner. Accordingly, the Court finds that Plaintiffs did not exercise reasonable diligence and that Posner's testimony does not constitute new evidence.

### iv. FBI Materials

It is undisputed that Plaintiffs requested evidence from the FBI regarding its investigation while it was ongoing and those requests were uniformly denied. Perticone Decl. ¶ 13. Defendants argue that the FBI materials do not constitute new evidence because the information contained therein was otherwise available to Plaintiffs or is merely cumulative of evidence already offered.

Defs. Resp. Mem. – Mot. Recons. at 20-21, 23-27. Alternatively, Defendants argue that the FBI

materials are inadmissible. Id. at 23-27.

For the purposes of the Motion for reconsideration, Plaintiffs rely on four groups of evidence

from the FBI materials: (1) handwritten statements of Plaintiffs' former employees; (2) photographs

of dirt delivered to Upstate and money; (3) FBI seizure tickets recording the receipt of alleged bribe

money from Plaintiffs' former employees; and (4) the statements of an Ontario Trucking driver

("Ontario Trucking Whistleblower") in an FBI 302 statement and a recorded conversation between

the Whistleblower and Weitsman. Pls. Recons. Mem. at 17.[11]

The handwritten statements of Plaintiffs' former employees do not qualify as new evidence.

The Court considered the depositions of Plaintiffs' former employees in the September Order and

found that they did not create an issue of material fact as to Defendants' bad faith. Sept. Order at 7-

8. Specifically, the Court found that the testimony did not show that the payments received by

Plaintiffs' employees could be traced back to Northeastern. Id. The handwritten statements now

submitted do not materially add to the testimony considered by the Court in the September Order.

See Am. Civil Liberties Union v. Dep't of Defense, 406 F. Supp. 2d 330, 332 (S.D.N.Y. 2005)

(stating that new evidence must not be "merely cumulative . . . of evidence already offered").

Moreover, the handwritten statements are hearsay. While Plaintiffs argue that the statements are

admissible under the residual exception to the hearsay rule, in Federal Rule of Evidence 807, Pls.

Reply – Mot. Recons. at 8, the Court does not find that the statements are probative of the point on

---

[11] Plaintiffs state that they intend to move *in limine* to have all of the FBI materials admitted into evidence. Pls. Recons. Mem. at 17 n.12. The FBI materials were filed with the Court under seal. Dkt. No. 93; see also Dkt. Nos. 91-4 ("First Employee Statement"); 91-5 ("Second Employee Statement"); 91-6 ("302 Report"); 91-7 (" FBI Recording"); 91-8 ("FBI Photographs"); 91-9 ("FBI Tickets").

which they are offered. Finally, to the extent that Plaintiffs suggest that the statements are admissible for impeachment, impeachment is not a proper basis for reconsideration. See United States v. Int'l Bhd. of Teamsters, 179 F.R.D. 444, 447-48 (S.D.N.Y. 1998) ("It is well established that evidence offered solely to impeach the credibility of a witness does not meet the stringent standards for relief under Rule 60(b)(2).").

Next, Defendants argue that Plaintiffs were aware of Ontario Trucking and had the opportunity to depose its employees. Defs. Resp. Mem. – Mot. Recons. at 20-21. Weitsman met with the Ontario Trucking Whistleblower in July 2011 and Plaintiffs had his cell phone number. Defendants assume that if Plaintiffs deposed the Whistleblower, they could have obtained the information in the statements he made to the FBI. Where a party lacks access to evidence, but the evidence is available through other means, a court may find an absence of diligence. See In re Neurontin Mktg. & Sales Practices Litig., 799 F. Supp. 2d 110, 115-16 (D. Mass. 2011) (finding that scholarly article providing meta-analysis of studies which were available during trial was not new evidence because party could have performed similar meta-analysis). Thus, Defendants' argument is that while Plaintiffs exercised diligence as to the FBI materials, they did not exercise diligence as to contacting the Ontario Trucking Whistleblower. While Defendants' argument has some logic, the Court will not speculate as to what evidence Plaintiffs could have obtained if they had deposed the Whistleblower. Defendants do not dispute that Plaintiffs were diligent in seeking the FBI materials; accordingly, the Court will consider the 302 Report and recorded conversation as new evidence and will address their admissibility.

The 302 Report contains several levels of hearsay: it is an out-of-court statement that summarizes the FBI's interview with the Ontario Trucking Whistleblower, who reported matters he

learned about from others. The 302 Report itself is admissible as a business record or a public record. See Spanierman Gallery, Profit Sharing Plan v. Merritt, No. 00CIV5712, 2003 WL 22909160, at *5-6 (S.D.N.Y. Dec. 9, 2003) (citing FED. R. EVID. 803(6); 803(8)). The statements within the 302 Report are admissible if they fall within an exception to the hearsay rule. See FED. R. EVID. 805. Plaintiffs first assert that the statements contained in the report are admissible as statements against interest of an unavailable witness. Pls. Reply – Mot. Recons. at 8 (citing FED. R. EVID. 804(b)(3)). A "statement against interest" is a statement that "a reasonable person . . . would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability." FED. R. EVID. 804(b)(3)(A). Having reviewed the Report, the Court does not find that the Whistleblower's statements contained therein are so clearly against his interest as to fall within 804(b)(3). See Dora Homes, Inc. v. Epperson, 344 F. Supp. 2d 875, 885 (E.D.N.Y. 2004). Rather, the Report states that the Whistleblower made deliveries to Upstate; that he was not permitted to see where the trucks were loaded; and that he made payments to Upstate employees to unload the trucks more quickly. 302 Report.

Plaintiffs next argue that the Ontario Trucking Whistleblower was an agent of Northeastern when he made the statements. Pls. Reply – Mot. Recons. at 8 (citing FED. R. EVID. 801(d)(2)(D)). "In order for evidence to be admissible pursuant to Rule 802(d)(2)(D), the proponent of the evidence must establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 238 (2d Cir. 2006). The proponent of hearsay evidence bears the burden of showing that an exception applies. Torres v. Gristede's

Operating Corp., 628 F. Supp. 2d 447, 469-70 (S.D.N.Y. 2008). However, Plaintiffs have not established that the Ontario Trucking Whistleblower was an agent of Northeastern. Indeed, Defendants' responsibility for the conduct of Ontario Trucking is a disputed fact. See Defs. Resp. Mem. – Mot. Recons. at 20.

Finally, Plaintiffs argue that the 302 Report is admissible under the residual exception to the hearsay rule. Pls. Reply – Mot. Recons. at 8. "Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991). The Court does not find that the 302 Report "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable effort." FED. R. EVID. 807(a)(3). As discussed *supra*, the 302 Report does not show that the Whistleblower had personal knowledge that the trucks were loaded with dirt and that Northeastern made payments to Plaintiffs' employees to inaccurately record the amount of dirt. Accordingly, Plaintiffs have not identified a hearsay exception under which the Whistleblower's statements in the 302 Report are admissible.

Defendants argue that the audiotape recording of the conversation between the Ontario Trucking Whistleblower and Weitsman lacks proper authentication and is hearsay. Defs. Resp. Mem. – Mot. Recons. at 23-24. Even assuming that the recording was properly authenticated, Plaintiffs have not established that a hearsay exception applies. The recording is an out-of-court statement offered to prove the truth of the matters contained therein. See Pls. Recons. Mem. at 21. Plaintiffs do not identify a hearsay exception applicable to the recording other than the exceptions they argued apply to the 302 Report, which the Court rejected. Pls. Reply – Mot. Recons. at 9. Moreover, to the extent Plaintiffs argue that the recording is admissible "to establish a conspiratorial

relationship between them, Northeastern, and Plaintiffs' former employees," that argument is misguided. The fact that Weitsman met with a driver from Ontario Trucking is not evidence of a conspiracy between Ontario Trucking, Northeastern, and Plaintiffs' employees. Accordingly, the recording is inadmissible.

Finally, Plaintiffs offer photographs of buckets of dirt and money and FBI Tickets recording the receipt of money from Plaintiffs' former employees. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support its finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Plaintiffs offer the declaration of Agent Bokal to authenticate the photographs. Dkt. No. 91-10. Agent Bokal states generally that the photographs in the FBI materials "fairly and accurately reflect the locations, vehicles, people, and scenes depicted as of the time the photographs were taken." Id. ¶ 6. However, there is no foundation for what the photographs represent; as Defendants argue, there is no "explanation for the context, timing, source, or location of the photos." Defs. Resp. Mem. – Mot. Recons. at 27. Accordingly, the Court will not consider the photographs as evidence on Plaintiffs' Motion for reconsideration. The FBI Tickets are admissible as records of a regularly conducted activity. FED. R. EVID. 803(6).

## 2. Reconsideration of the September Order

Thus, the Court finds that the only admissible new evidence that Plaintiffs have offered are the Crosses' depositions and FBI Tickets. Accordingly, the Court must consider whether the Crosses' depositions would have altered the conclusion reached by the Court in the September Order. Shrader, 70 F.3d at 257. In the September Order, the Court found that Defendants had made out a *prima facie* case for breach of contract, which Plaintiffs could only refute by showing that

30

Defendants' bad faith conduct excused Plaintiffs' nonperformance under the contract. Sept. Order at 5-6. The Court further found that Plaintiffs failed to raise a genuine dispute of fact regarding Defendants' bad faith. Id. at 6.

The Court finds that the Crosses' depositions do not meet the "strict" standard for reconsideration. Shrader, 70 F.3d at 257. Cross, Sr. and Cross, Jr. were both employed in the Northeastern yard during the relevant period of dealings between Plaintiffs and Defendants. Dkt. Nos. 91-11 ("Cross, Sr. Deposition") at 24:10-17; 91-12 ("Cross, Jr. Deposition") at 17:9-11. Both Crosses operated a shearer, Cross, Sr. Dep. at 24:13; Cross, Jr. Dep. at 17:15-17, which is a cutting machine, Cross, Sr. Dep. at 13:6-8; Cross, Jr. Dep. at 15:19-16:6. The shearer was used, *inter alia*, to process cars. Cross, Sr. Dep. at 25:23-26:2. Cross, Sr. described the following steps in processing a car: removing the battery, radiator, air conditioner, wire harness, heater core, and electric motor; cutting the shock towers; removing the gas tank; taking off the front end; removing the motor and transmission; and cutting off one side of the roof to lift it up. Id. at 27:1-31:21. After the roof was cut open, the car would be taken to the baler. Id. at 32:1-3. The baler was used to crush the cars into cubes. Cross, Jr. Dep. at 24:8-13. Northeastern employees then loaded the cars into trucks. Cross, Sr. Dep. at 36:20-22; Cross, Jr. Dep. at 28:7-9.

The relevant part of the Crosses' testimony, Plaintiffs argue, is their explanation of how dirt and fill material were loaded into outgoing trucks in order to increase their weight. The capacity for most trucks was thirty-two tons. Cross, Jr. Dep. at 22:8-9. The trucks would be weighed when arriving empty at Northeastern's yard and then weighed when leaving with a full load. Id. at 34:7-8. The Crosses explain that dirt and fill were added to the loads at several points. First, at the baler,

each car would be loaded, through the open roof, with dirt and mill scale[12] before being crushed. Cross, Sr. Dep. at 32:8-13; Cross, Jr. Dep. at 40:14-19. Cross, Jr. estimated that one to two grapples of dirt, weighing approximately one ton to one and a half tons, and one grapple of mill scale, weighing approximately two tons, would be put into each car. Cross, Jr. Dep. at 43:21-25. After the dirt and mill scale were loaded into the car, the roof would be folded back over and the baler would be used to cube the car. Cross, Sr. Dep. at 34:11-13; Cross Jr. Dep. at 44:4-6. Cross, Jr. stated that he was told by Laidlow to put scrap into the cars. Cross, Jr. Dep. at 40:20-41:1.

Each truck was then loaded beginning with three flattened cars across the bottom. Cross, Jr. Dep. at 45:14-18. A layer of shred—crushed household items, like stoves, microwaves, and fridges, id. at 22:12-18—would be loaded on top of the flattened cars, id. at 45:13. The truck would then be weighed, and depending on the weight, mill scale and dirt would be spread across the load. Id. at 47:15-19; Cross, Sr. Dep. at 49:15-19. Finally, a layer of cubed cars—containing dirt and mill scale—would be put on top.[13] Cross, Jr. Dep. at 46:7-8. Cross, Jr. estimated each thirty-two ton capacity truck was loaded with seven to ten tons of non-scrap material. Id. at 50:6-8. The Crosses observed piles of dirt, Cross, Sr. Dep. at 35:22-25; piles of mill scale, Cross, Jr. Dep. at 48:9-12; a

---

[12] Cross, Jr. said that mill scale is "basically a black sand, but it's heavy." Cross, Jr. Dep. at 42:24-43:1.

[13] It is unclear how may cubed cars would be loaded into each truck; at some points, the Crosses testified that three cars were added to each truck, Cross, Sr. Dep. at 49:22; Cross, Jr. Dep. at 47:24, at others, they testified that six to eight cars were added, Cross, Jr. Dep. at 46:12-15. See also Cross, Sr. Dep. at 52:11-15 (estimating that 32-36 cubes would fit into a 45-foot trailer).

pile of slag,[14] Cross, Jr. Dep. at 53:19-20; and a pile of radioactive materials,[15] Cross, Jr. Dep. at 61:25-62:3. The Crosses observed the amount of materials in these piles increasing and decreasing.[16] Cross, Sr. Dep. at 36:4-6; Cross, Jr. Dep. at 49:22-24.

The Crosses state that they were informed by Goldie that shipments containing excessive amounts of non-scrap materials were going to Upstate. Cross, Sr. Dep. at 46:15-17; Cross, Jr. Dep. at 50:20-23. They also state that they raised concerns about the amount of non-scrap materials in outgoing loads with Goldblatt, but that their concerns were never addressed. Cross, Sr. Dep. at 64:12-18; 65:13-15; Cross, Jr. Dep. at 65:20-25.

The Crosses' depositions fail to raise an issue of material fact as to Defendants' bad faith. First, the Crosses had no personal knowledge that the trucks they loaded with non-scrap materials were heading to Upstate. Cross, Sr. Dep. at 78:25-79:4; Cross, Jr. Dep. at 69:12-18; 70:13-16. Northeastern shipped materials to other customers, including landfills. Cross, Jr. Dep. at 69:20-70:4. Second, the Crosses' testimony does not connect Northeastern to the alleged payments made by Ontario Trucking to Plaintiffs' employees to under-record the amount of non-scrap material in incoming loads. Nor do the FBI Tickets permit the inference that the payments could be traced to Defendants. Thus, Plaintiffs have failed to meet the strict standard for reconsideration.

### D. Motion to Enforce Protective Order

---

[14] Cross, Sr. described slag as "metal all melted together." Cross, Sr. Dep. at 58:8-9.

[15] Less radioactive material was added to loads in order to avoid being "detected" because the radioactivity of each outgoing truck was measured before leaving the yard. Cross, Sr. Dep. at 63:25-64:8.

[16] Cross, Sr. estimated the amount of the dirt pile at 20-30 tons and the mill scale pile at 40-50 tons. Cross, Sr. Dep. at 36:1-3; 57:21-22.

On March 2, 2015, the Court entered a Protective Order as to the FBI materials. Prot. Order. The Protective Order was entered upon stipulation of the parties that certain information in the FBI materials may be subject to the Privacy Act, 5 U.S.C. § 552a.[17] Id. The Protective Order provides that

a. The disc containing the Subpoenaed Information and the cover letter enclosing it shall be marked "SUBJECT TO PROTECTIVE ORDER" when disclosed. Counsel for the parties shall ensure . . . that anyone viewing Subpoenaed Information is aware that it is subject to this Protective Order.

b. Access to the Subpoenaed Information shall be limited to the Court, Court personnel (including all Court staff, court reporters, and translators), the parties to the above styled litigation, counsel for the parties and counsels' personnel, expert witnesses and their personnel, any government agency or government employee with whom counsel for the United States shares the information, and any other person mutually authorized by all counsel or this Court to examine such materials. . . .

d. All Subpoenaed Information shall be used by the parties only for purposes of litigating the above-captioned case, including any subsequent appeals. Persons receiving copies of the Subpoenaed Information or its contents shall not use such material for any other purpose.

e. Except as otherwise provided in this Order, no person having access to the Subpoenaed Information shall make any public disclosure of those materials without further Order of this Court or stipulations by all counsel.

Id. at 2-3.

Defendants assert, and Plaintiffs admit, that James Land ("Land"), Upstate's Chief Operations and Security Officer, made certain of the FBI materials available to the Ontario Ministry

---

[17] The Privacy Act "sets forth conditions for disclosure of private information and precludes an agency from disclosing information in its files to any person or to another agency without the prior written consent of the individual to whom the information pertains." Devine v. United States, 202 F.3d 547, 550 (2d Cir. 2000) (citing 5 U.S.C. § 552a(b)). The Privacy Act contains certain exceptions under which disclosure is authorized, including "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. § 552a(b)(11).

of Environment and Climate Change. Dkt. No. 116 ("Plaintiffs Response – Motion to Enforce Protective Order") at 1;[18] see also Dkt. No. 116-1 ("Land Affidavit"). Defendants request that the Court order Plaintiffs to show cause how they violated the Protective Order; retrieve all improperly disclosed materials and copies thereof; not commit any further violations of the Protective Order; and pay Defendants the costs of bringing this Motion. Mot. Enforce Prot. Order Mem. at 1. Plaintiffs argue that the disclosure did not violate the Protective Order and that even assuming it was a violation, the disclosure was made for a legitimate purpose. Pls. Resp. – Mot. Enforce Prot. Order at 2.

Plaintiffs argue that the Protective Order was not violated because (1) the disclosure was not public, (2) the FBI disclosed the same materials to the New York State Police Department, and (3) the FBI had previously worked with Canadian authorities in its investigation of Northeastern. Id. The Court does not find Plaintiffs' arguments that the Protective Order was not violated persuasive. "A protective order should be read in a reasonable and common sense manner so that its prohibitions are connected to its purpose." On Command Video Corp. v. Lodgenet Entm't Corp., 976 F. Supp. 917, 921 (N.D. Cal. 1997). The Protective Order specifies the parties who shall access the FBI materials; the disclosure of the materials to non-listed parties is "public." Prot. Order at 2-3. Accordingly, contrary to Plaintiffs' argument, the disclosure to the Canadian authorities was a "public" disclosure. Furthermore, the Protective Order mandates that the FBI materials shall only be used for the purpose of litigating this action. Id. at 3. Plaintiffs disclosed the FBI materials to the Canadian authorities not for the purposes of litigating this action, but in the hope that the Canadian

_____

[18] Plaintiffs' Response in opposition to Defendants' Motion to enforce the Protective Order was filed with the Court under seal. Dkt. No. 118.

authorities would commence criminal proceedings against Northeastern. Plaintiffs' arguments that the Protective Order was not violated because the FBI shared the materials with other governmental entities have no bearing on whether Plaintiffs violated the Protective Order by disclosing the materials to the Canadian authorities.

Plaintiffs assert that any violation of the Protective Order was harmless because all of the individuals whose Privacy Act information is contained in the FBI materials have otherwise been publically referred to in this action. Pls. Resp. – Mot. Enforce Prot. Order at 10-11, 13 (citing references to individuals whose Privacy Act information is contained in the FBI materials). Plaintiffs are correct that the individuals whose Privacy Act information act is contained in the FBI materials have been otherwise referred to throughout this action. However, the Court does not agree with Plaintiffs' attempts to discount the protections of the Privacy Act.[19] The "protected interests" in the Privacy Act "reflect a congressional judgment that certain delineated categories of documents may contain sensitive data which warrants a more considered and cautious treatment" in discovery. Laxalt v. McClatchy, 809 F.2d 885, 889 (D.C. Cir. 1987) (quoting Friedman v. Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1344 (D.C. Cir. 1984)). "Procedurally, then, when the District Court considers a request for a Privacy Act order in the discovery context it must consider the use of protective orders and the possibility of *in camera* inspection." Id. In this case, the Court entered a Protective Order, which Plaintiffs knowingly violated by disclosing materials to a foreign governmental agency in the hope of initiating criminal proceedings against Defendants. Although the identities of the individuals had otherwise been publically referred to, the Protective Order

---

[19] The Court denies Plaintiffs' request to modify the Protective Order. Pls. Resp. – Mot. Enforce Prot. Order at 11-12.

explicitly prohibits the use of the FBI materials for any purposes other than litigating this action.

See On Command Video, 976 F. Supp. at 922 (finding that "*use* of protected information to file a *separate* state court lawsuit—as opposed to *this* litigation—is tantamount to no compliance at all"). Accordingly, Plaintiffs are ordered to not commit any further violations of the Court's Protective Order. Defendants are also awarded reasonable attorneys' fees and expenses for bringing their Motion to enforce the Protective Order. See In re Biovail Corp. Sec. Litig., 247 F.R.D. 69, 71 (S.D.N.Y. 2007). Defendants shall submit an affidavit supporting its attorneys' fees and expenses in filing the Motion to enforce the Protective Order within ten (10) days of this Memorandum-Decision and Order. Plaintiffs may file a response no later than seven (7) days after Defendants have filed their affidavit.

## IV.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' Motion (Dkt. No. 91) for reconsideration is **DENIED**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 98) to preclude evidence and for an award of attorneys' fees is **DENIED**; and it is further

**ORDERED**, that Plaintiffs' Cross-Motion (Dkt. No. 104) for Rule 37 sanctions is **DENIED**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 109) for sanctions is **DENIED**; and it is further

**ORDERED**, that Plaintiffs' request (Dkt. No. 115) for attorneys' fees in responding to Defendants' Motion for sanctions is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs submit an affidavit in support of their attorney's fees and costs in responding to Defendants' Motion for sanctions **within ten (10) days** of this Memorandum-Decision and Order. Defendants may file a response **within seven (7) days** of Plaintiffs filing their affidavit; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 112) to enforce the Protective Order is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs commit no further violations of the Protective Order and pay Defendants attorneys' fees and costs of bringing the Motion to enforce the Protective Order; and it is further

**ORDERED**, that Defendants submit an affidavit in support of their attorneys' fees and costs in filing the Motion to enforce the Protective Order **within ten (10) days** of this Memorandum-Decision and Order. Plaintiffs may file a response **within seven (7) days** of Defendants filing their affidavit; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 02, 2016
                Albany, NY

Lawrence E. Kahn
U.S. District Judge